# STATE OF CONNECTICUT *v.* DARRELL ATKINSON
## (14922)

Callahan, Borden, Berdon, Katz and Palmer, Js.

Argued October 27, 1995—decision released January 23, 1996

*Lauren Weisfeld*, assistant public defender, for the appellant (defendant).

*Harry Weller*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Elpedio Vitale*, assistant state's attorney, for the appellee (state).

KATZ, J. Following a jury trial, in which the charges in two substitute informations were joined, the defendant, Darrell Atkinson, was convicted[1] of one count each of felony murder in violation of General Statutes § 53a-54c,[2] robbery in the first degree in violation of General

---

[1] The defendant was acquitted of the third charge in the second information, namely possession of a weapon in a correctional institution in violation of General Statutes § 53a-174a (a).

[2] General Statutes § 53a-54c provides: "Felony murder. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other

Statutes §§ 53a-8 and 53a-134 (a) (4), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (4), attempted assault in the first degree in violation of General Statutes §§ 53a-8, 53a-49 and 53a-59 (a) (1), escape in the first degree

participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

General Statutes § 53a-8 provides in relevant part: "Criminal liability for acts of another. (a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

General Statutes § 53a-134 provides in relevant part: "Robbery in the first degree: Class B felony. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. . . ."

General Statutes § 53a-133 provides: "Robbery defined. A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

General Statutes § 53a-48 provides in relevant part: "Conspiracy. Renunciation. (a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

General Statutes § 53a-49 provides: "Criminal attempt: Sufficiency of conduct; renunciation as defense. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

in violation of General Statutes § 53a-169 (a) (1), and assault in the second degree in violation of General Statutes § 53a-60 (a) (5). The trial court imposed a total effective sentence of ninety-five years imprisonment.[3]

The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).[4] He raises four

"(b) Conduct shall not be held to constitute a substantial step under subdivision (2) of subsection (a) of this section unless it is strongly corroborative of the actor's criminal purpose. Without negating the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law: (1) Lying in wait, searching for or following the contemplated victim of the crime; (2) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission; (3) reconnoitering the place contemplated for the commission of the crime; (4) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed; (5) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances; (6) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances; (7) soliciting an innocent agent to engage in conduct constituting an element of the crime.

"(c) When the actor's conduct would otherwise constitute an attempt under subsection (a) of this section, it shall be a defense that he abandoned his effort to commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

General Statutes § 53a-59 provides in relevant part: "Assault in the first degree: Class B felony. (a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

General Statutes § 53a-169 provides in relevant part: "Escape in the first degree: Class C felony. (a) A person is guilty of escape in the first degree (1) if he escapes from a correctional institution . . . ."

General Statutes § 53a-60 provides in relevant part: "Assault in the second degree: Class D felony. (a) A person is guilty of assault in the second degree when . . . (5) he is a parolee from a correctional institution and with intent to cause physical injury to an employee or member of the Board of Parole, he causes physical injury to such employee or member."

[3] Specifically, the trial court sentenced the defendant to fifty years imprisonment on the felony murder conviction; fifteen years imprisonment each

issues: (1) the trial court improperly concluded that he was not in custody when two detectives interrogated him regarding his involvement in the murder of Edward Sebastian Moore without having first provided him with *Miranda*[5] warnings; (2) this court should reject the holding in *Oregon* v. *Elstad*, 470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985),[6] and conclude that the trial court improperly failed to suppress a statement that he gave following the receipt of *Miranda* warnings; (3) the trial court improperly joined the murder and escape cases;[7] and (4) certain of the prosecutor's statements during closing argument violated his constitutional rights to due process and a fair trial.

The jury reasonably could have found the following facts. On the evening of February 27, 1992, the defend-

on the robbery in the first degree conviction, the conspiracy to commit robbery in the first degree conviction, and the attempt to commit assault in the first degree conviction; ten years imprisonment on the escape in the first degree conviction; and five years imprisonment on the assault in the second degree conviction. All sentences are to run consecutively to one another, except for the fifteen year sentence on the conspiracy to commit robbery in the first degree conviction, which term is to run concurrently to the convictions for felony murder and robbery in the first degree.

[4] General Statutes § 51-199 provides in relevant part: "Jurisdiction. (a) The supreme court shall have final and conclusive jurisdiction of all matters brought before it according to law, and may carry into execution all its judgments and decrees and institute rules of practice and procedure as to matters before it.

"(b) The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[5] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[6] See footnote 15.

[7] For ease of discussion, we will refer to the first set of charges, which includes the counts alleging felony murder, robbery in the first degree, conspiracy to commit robbery in the first degree, and attempted assault in the first degree, as the murder case and to the second set of charges, which includes the counts alleging escape in the first degree, assault in the second degree, and possession of a weapon in a correctional institution, as the escape case.

ant, along with three others, Ryan Myers,[8] Richard Smith and Andre Rogers, was in Roberto Clemente Park in New Haven. The defendant, Myers and Smith wore black clothing with black or purple hoods. Rogers, in contrast, wore a turquoise "Miami Dolphins" jacket and a baseball hat; he was not wearing a hood. That same evening, the victim, Edward Sebastian Moore, and his friend, Charles Stevenson, were in the park selling cocaine. Rogers walked past Moore and Stevenson and exited the park. The defendant, Myers and Smith remained in the park until Moore and Stevenson walked out, at which time the defendant and the two others, all of whom wore masks, robbed and shot them. Moore, who was shot in his right knee and chest, was killed. Stevenson was only grazed in the left leg by a bullet.[9] Thereafter, the defendant was charged in a four count substitute information with felony murder, robbery in the first degree, conspiracy to commit robbery in the first degree and attempted assault in the first degree. Additional facts will be presented as needed.

I

The first issue on appeal that we consider is whether the defendant was in custody during his interrogation when he implicated himself in Moore's murder. The trial court found the following facts pertaining to this issue. Two days after the murder, two plainclothes detectives, Joseph Greene and James Ponteau, of the New Haven police department, went to the defendant's home, where he was on supervised home release, in order to inquire about an unrelated robbery that had occurred in the vicinity of the park on the same night as the murder. After speaking with the detectives for

---

[8] Myers is also referred to by the defendant and other witnesses as Matthew Little.

[9] Expert testimony at trial indicated that the three shots were fired by three different guns. Thus, a jury could reasonably have concluded that each of the three assailants, including the defendant, fired a shot.

about five minutes, the defendant agreed to go with them to the police station in order to be questioned further. They rode to the police station in an unmarked car, with the defendant sitting alone in the back seat. Upon arriving at the station, they went to an interrogation room on the third floor, where the defendant was interrogated in a closed room. Without receiving *Miranda* warnings, the defendant was first questioned about the unrelated robbery. Those questions and answers were not recorded. Once the questioning turned to the murder case, the defendant was advised of his *Miranda* rights. He waived his rights, continued to answer questions, and implicated himself in the crimes with which he was charged in the murder case. He placed himself in the park on the night of the murder[10] and stated that he was wearing black clothing and a hood, as he usually did.[11] That portion of the interroga-

---

[10] The defendant, during his interrogation by Ponteau following his *Miranda* warnings, stated:

"Q. Darrell getting back to February 27th, 1992, were you in the area of Columbus Avenue and Arch Street?

"A. Yes I was.

"Q. Darrell, was there anyone else in your company? . . .

"A. Andre Rogers, Matthew Little and Richard Smith.

"Q. Darrell, what were the four of you doing?

"A. We was all . . . on the basketball court just . . . hanging around and then two guys approached you know what I'm saying and one of the dudes that I was with said let's go gank um so we started walking over I thought they was just bullshitting so next thing I know that one said let me bust him and take his shit and that person was Andre Rogers.

"Q. Darrell you said they said let's gank him what does gank him mean?

"A. Take his . . . stuff."

[11] The defendant further stated during his interrogation by Ponteau:

"Q. What were you wearing Thursday night?

"A. I always wear black just like you see now.

"Q. You had on the same clothing?

"A. If it's not this but I don't have on a sweater it just be this.

"Q. And . . . did you have a hood on that night?

"A. At night I always wear my hood.

"Q. So you had your hood on Thursday night yes or no?

"A. Yes."

tion was recorded and transcribed and, subsequently, signed by the defendant.[12]

Prior to trial, the defendant moved to suppress his statement on the grounds that his rights under the fifth, sixth and fourteenth amendments[13] to the United States constitution had been violated. He argued, inter alia, that because he was in custody when the interrogation began, and had not first been provided with *Miranda* warnings, his entire statement should be suppressed, including the portion he gave after receiving *Miranda*

[12] There is conflicting evidence regarding the amount of information that the defendant had provided about the murder prior to being advised of his *Miranda* rights. Ponteau testified during the suppression hearing that he had questioned the defendant for twenty-five to thirty minutes prior to advising him of his *Miranda* rights and that, during this segment of the interview, he had obtained all of the information that was subsequently included in the transcribed formal statement. The defendant relies primarily on this testimony to argue that the inculpatory statement that he gave prior to being warned should have been suppressed. In contrast, Greene testified that *Miranda* warnings were provided as soon as the defendant stated that he was in the park on the night of the murder. Because the trial court, *Fracasse, J.*, concluded that the defendant was not in custody at any point in the interrogation at the police station, and that, therefore, no *Miranda* warnings were required, it did not have occasion to decide the issue of precisely when the *Miranda* warnings were given. The trial court did state in its opinion, however, that "[o]nce [the conversation turned to the murder,] it was then stopped and the police advised the defendant of his *Miranda* [r]ights . . . ."

[13] The fifth amendment to the United States constitution provides in relevant part: "No person shall . . . be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ."

The sixth amendment to the United States constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

warnings, because that portion was the product of a prior unwarned and, therefore, inadmissible statement. The trial court, *Fracasse, J.*, denied the defendant's motion to suppress, finding that he "was not at any time in custody, he was at all times free to leave. And a reasonable person under the circumstances would not have believed that he was not free to leave. Therefore the giving of the *Miranda* [w]arnings was not necessary; but they were given, they were understood, and they were waived."

The defendant claims on appeal that the trial court's finding that he was not in custody at any point during the interrogation, and, therefore, was not entitled to *Miranda* warnings, is not supported by substantial evidence. The defendant argues alternatively that either he was in custody from the beginning of the interrogation or that the interrogation became custodial once questioning turned to the murder case. Because he was in custody, he asserts that the statement that he gave prior to receiving *Miranda* warnings, which included information implicating him in the murder,[14] should have been suppressed. Furthermore, the defendant claims that if this court agrees that he was in custody and that the statement he provided prior to receiving *Miranda* warnings should have been suppressed, this court should then, as a matter of state, rather than federal, constitutional law, reject the holding of the United States Supreme Court in *Oregon* v. *Elstad*, supra, 470 U.S. 298,[15] and conclude that the transcribed state-

---

[14] See footnote 12.

[15] In *Oregon* v. *Elstad*, supra, 470 U.S. 298, the United States Supreme Court held that, under the United States constitution, the initial failure to administer *Miranda* warnings to a suspect who voluntarily provides an incriminating statement, in the absence of actual coercion by law enforcement officers, does not taint any subsequent admissions that are made after the suspect has been fully advised of and has waived his *Miranda* rights. The court reasoned that, although the goal of providing *Miranda* warnings is to eliminate the coercive atmosphere inherent in custodial interrogations and the failure to administer *Miranda* warnings creates a presumption of

ment that he furnished after the warnings had been given should also have been suppressed. Because we agree with the trial court's conclusion that the defendant was not in custody, we do not reach the *Elstad* issue.

"Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation.[16] *Miranda* v. *Arizona*, [384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)]." (Internal quotation marks omitted.) *State* v. *Williams*, 227 Conn. 101, 112, 629 A.2d 402 (1993); accord *State* v. *DesLaurier*, 230 Conn. 572, 576, 646 A.2d 108 (1994). "As stated by the United States Supreme Court in *California* v. *Beheler*, [463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983)], '[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest. [*Oregon* v. *Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977)].' See also

compulsion, "a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, [does not] so [taint] the investigatory process that a subsequent voluntary and informed waiver is ineffective . . . . Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." Id., 309.

The defendant argues that we should, under our state constitution, reject *Elstad* and, instead, adopt a totality of the circumstances test whereby we would determine the voluntariness and, therefore, the admissibility of the second statement by examining the entire interrogation, focusing on such factors as the severity of the police illegality in obtaining the first statement, the time lapse between the invalid statement and the valid statement, whether the suspect was confined during that time lapse or had contact with family members or an attorney, and the age and education of the suspect.

[16] The parties agree that the defendant was interrogated.

*New York* v. *Quarles*, 467 U.S. 649, 655, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984); *Minnesota* v. *Murphy*, 465 U.S. 420, 430–31, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984); *United States* v. *Cadmus*, 614 F. Sup. 367, 370 (S.D.N.Y. 1985)." *State* v. *Pittman*, 209 Conn. 596, 608, 553 A.2d 155 (1989); accord *State* v. *Ross*, 230 Conn. 183, 204, 646 A.2d 1318 (1994), cert. denied,  U.S.  , 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); see also *Thompson* v. *Keohane*,  U.S.  , 116 S. Ct. 457, 466–67, 133 L. Ed. 2d 383 (1995). "Further, the United States Supreme Court has adopted an objective, reasonable person test for determining whether a defendant is in custody. . . . Thus, in determining whether *Miranda* rights are required, *the only relevant inquiry is whether a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest.*" (Citations omitted; emphasis added.) *State* v. *DesLaurier*, supra, 577.

Furthermore, we note that "[n]o definitive list of factors governs a determination of whether a reasonable person in the defendant's position would have believed that he or she was in custody. Because, however, the *Miranda* court expressed concern with protecting defendants against interrogations that take place in a 'police-dominated atmosphere' containing 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely'; *Miranda* v. *Arizona*, supra, 384 U.S. [467]; circumstances relating to those kinds of concerns are highly relevant on the custody issue. See generally C. Whitebread & C. Slobogin, Criminal Procedure (3d Ed. 1993) § 16.03, pp. 385–91; 1 W. LaFave & J. Israel, Criminal Procedure (1984) § 6.6, pp. 494–99." *State* v. *DesLaurier*, supra, 230 Conn. 577–78.

The defendant bears the burden of proving custodial interrogation. *State* v. *Pittman,* supra, 209 Conn. 606. The trial court's determination of the historical circumstances surrounding the defendant's interrogation are findings of fact; id.; which will not be overturned unless they are clearly erroneous. *State* v. *Young,* 191 Conn. 636, 652, 469 A.2d 1189 (1983); *State* v. *Ostroski,* 186 Conn. 287, 292, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982); see Practice Book § 4061. In order to determine the ultimate issue of custody, however, we will conduct a scrupulous examination of the record; *State* v. *Weidenhof,* 205 Conn. 262, 267–68, 533 A.2d 545 (1987); in order to ascertain whether, in light of the totality of circumstances, the trial court's finding is supported by substantial evidence.[17] *State* v. *Pittman,* supra, 606; *State* v. *Toste,* 198 Conn. 573, 580, 504 A.2d 1036 (1986); *State* v. *Alexander,* 197 Conn. 180, 185, 496 A.2d 486 (1985).

Applying these principles to the facts of this case, we conclude that there is substantial evidence in the

[17] Our review of the issue of custody comports with the United States Supreme Court's recently enunciated two part test for determining custody. "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. . . . The first inquiry, all agree, is distinctly factual. . . . The second inquiry, however, calls for application of the controlling legal standard to the historical facts. This ultimate determination, we hold, presents a 'mixed question of law and fact' qualifying for independent review." *Thompson* v. *Keohane,* supra, 116 S. Ct. 465. This analysis is similar to the one that we have always applied. We first examine the trial court's conclusion regarding the historical facts in order to determine whether it is clearly erroneous. We next conduct an independent review in light of the totality of the circumstances by scrupulously examining the record to determine if an application of the law to the facts leads us to conclude that the defendant was in custody. In contrast with the Supreme Court, however, we have never expressly labeled this second determination as a mixed question of law and fact. We note that the court applied this label in interpreting 28 U.S.C. § 2254 (d), which affords a presumption of correctness to all issues of fact, in order to escape from the constraints of that presumption with respect to the ultimate issue of custody.

record to support the trial court's conclusion that the defendant had failed to prove that he was in custody when Greene and Ponteau interrogated him on February 29, 1992. The defendant was transported to the police station by those two plainclothes detectives in an unmarked vehicle after he had voluntarily agreed to accompany them. He was neither handcuffed nor arrested. The detectives did not display or threaten to use force, nor did they show their weapons. At the police station, the defendant was led to an interrogation room, where the door was closed but not locked. He was permitted to leave that room to use the bathroom unaccompanied. The defendant was at no time during this interrogation detained in the police station against his will. In fact, the detectives testified that he could stop responding to their questions and be driven home at any time. Indeed, the defendant testified that he understood that he would be brought home after the interrogation. He never indicated, however, any desire to terminate the interrogation or to go home.[18] Furthermore, the concerns of *Miranda* are not implicated in this case. The detectives did not take advantage of the inherently coercive situation that an interrogation inheres. They did not threaten or force the defendant to respond to their questions nor trick him in any way. Therefore, because a review of the facts in the record indicates that a reasonable person in the defendant's situation would not have believed that his movement was restricted to a degree that is associated with a

---

[18] Although the defendant testified that he was informed that he would be brought home when the interrogation concluded, the defendant argues that the detectives never communicated to him that he could have refused to accompany them to the police station or that he could stop answering questions and be driven home *at any time*. We have recognized, however, that "[w]hen [an] individual has not been arrested, a finding of custody requires some indication that the officer would not have heeded his or her request to depart." (Internal quotation marks omitted.) *State* v. *Northrop*, 213 Conn. 405, 415 n.7, 568 A.2d 439 (1990). Significantly, the defendant voluntarily went to the police station and never requested to leave.

formal arrest, we agree with the trial court's conclusion that the defendant was not in custody when he was interrogated.[19]

## II

The defendant next claims that the trial court abused its discretion in granting, over his objection, the state's pretrial motion to consolidate the two cases against him in a single trial. The following additional facts are relevant to this issue. Pending trial, the defendant was detained in the New Haven correctional center, from which he, along with his cellmate, Percell Blakeney, escaped on February 1, 1993. Having acquired forged medical passes, the defendant and Blakeney, armed with a "shank,"[20] left their cell and, after assaulting correction officer Lawrence Bellamy, stole his keys and escaped from the prison. The defendant was recaptured the next morning and confessed to escaping. He was charged in a three count substitute information with escape in the first degree, assault in the second degree,

[19] A review of previous cases supports our conclusion that, in light of the totality of the circumstances, the defendant was not in custody. See *State v. Williams*, supra, 227 Conn. 114 (defendant was not in custody where he was not frisked, physically restrained, threatened or coerced by police; he voluntarily answered police officers' questions; and he at no point indicated "that he did not want to talk to the officers or that he wanted to leave"); *State v. Rasmussen*, 225 Conn. 55, 77, 621 A.2d 728 (1993) (defendant was not in custody where he went to police station voluntarily and was never arrested); *State v. Northrop*, 213 Conn. 405, 414–15, 568 A.2d 439 (1990) (defendant was not in custody where he went to police station voluntarily to assist police in their investigation, was not arrested, and was driven home after giving statement); *State v. Pittman*, supra, 209 Conn. 606–607 (defendant was not in custody where detective testified that defendant was free to leave police headquarters at any time, defendant was questioned in unlocked interview room, was not arrested or handcuffed, left police station same night, and had prior experience with criminal justice system); cf. *State v. Hoeplinger*, 206 Conn. 278, 287–88, 537 A.2d 1010 (1988) (defendant was in custody where he was under constant police supervision, was ordered to sit in police cruiser, was not allowed to go to bathroom unaccompanied, and had no transportation home).

[20] A shank is a type of illegal weapon akin to a knife.

and possession of a weapon in a correctional institution. Thereafter, the state's motion to join the murder and escape cases for trial was granted.

The defendant argues on appeal that the trial court incorrectly granted the state's motion because "[t]he risk that the jury would improperly use the evidence of the escape to establish the murder, or that the defendant's rights would be otherwise prejudiced, was great . . . [and therefore] the defendant suffered substantial prejudice and . . . [was denied] a fair trial." We conclude that the trial court did not abuse its discretion in consolidating these two cases.

"General Statutes § 54-57 and Practice Book § 829[21] expressly authorize a trial court to order a defendant to be tried jointly on charges arising separately. In deciding whether to sever informations joined for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb. *State* v. *Greene*, 209 Conn. 458, 463, 551 A.2d 1231 (1988); *State* v. *Pollitt*, 205 Conn. 61, 67–68, 530 A.2d 155 (1987); *State* v. *Boscarino*, 204 Conn. 714, 720–21, 529 A.2d 1260 (1987); *State* v. *Bell*, 188 Conn. 406, 410–11, 450 A.2d 356 (1982); *State* v. *King*, 187 Conn. 292, 299, 445 A.2d 901 (1982); *State* v. *Jonas*, 169 Conn. 566, 570, 363 A.2d 1378 (1975), cert. denied, 424 U.S. 923, 96 S. Ct. 1132, 47 L. Ed. 2d 331 (1976)[Practice

---

[21] General Statutes § 54-57 provides: "Joinder of offenses of the same character. Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise."

Practice Book § 829 provides: "The judicial authority may, upon his own motion or the motion of any party, order that two or more indictments or informations or both, whether against the same defendant or different defendants, be tried together."

We note that, unlike § 54-57, § 829 does not limit joinder to cases that involve "offenses of the same character." *State* v. *King*, 187 Conn. 292, 296, 445 A.2d 901 (1982).

Book § 828].[22] The defendant bears a heavy burden of showing that the denial of severance resulted in substantial injustice, and that any resulting prejudice was beyond the curative power of the court's instructions. *State* v. *Boscarino*, supra, 721, quoting *State* v. *King*, supra, 302; *State* v. *Silver*, 139 Conn. 234, 240, 93 A.2d 154 (1952). *State* v. *Herring*, 210 Conn. 78, 94–95, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989). [W]hether a joint trial will be substantially prejudicial to the rights of the defendant . . . means something more than that a joint trial will be less than advantageous to the defendant . . . ." (Internal quotation marks omitted.) *State* v. *Jennings*, 216 Conn. 647, 657–58, 583 A.2d 915 (1990); accord *State* v. *Herring*, supra, 94–95.

We recognize that an improper joinder may expose a defendant to potential prejudice for three reasons. "First, when several charges have been made against the defendant, the jury may consider that a person charged with doing so many things is a bad [person] who must have done something, and may cumulate evidence against him . . . . Second, the jury may have used the evidence of one case to convict the defendant in another case even though that evidence would have been inadmissible at a separate trial. . . . [Third] joinder of cases that are factually similar but legally unconnected . . . present[s] the . . . danger that a defendant will be subjected to the omnipresent risk . . . that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all." (Citations omitted; internal quotation marks omitted.) *State* v. *Horne*, 215 Conn. 538, 546–47, 577 A.2d 694 (1990).

---

[22] Practice Book § 828 provides: "If it appears that a defendant is prejudiced by a joinder of offenses, the judicial authority may, upon his own motion or the motion of the defendant, order separate trials of the counts or provide whatever other relief justice may require."

"This court has held that there are several factors that a trial court should consider in determining whether severance is required in order to avoid [these risks]. . . . These factors include: (1) whether the charges involved discrete easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *Jennings*, supra, 216 Conn. 658; accord *State* v. *Herring*, supra, 210 Conn. 95. Applying these principles to this case, we conclude that joinder did not result in substantial injustice.

First, the charges arising from the two cases involved discrete and easily distinguishable factual scenarios. The first involved an assault, robbery and murder on the streets of New Haven, while the second involved the assault of a correction officer and an escape from a correctional center. These two incidents are factually distinct and occurred nearly one year apart. See *State* v. *Herring*, supra, 210 Conn. 96. Furthermore, presentation of evidence relating to these two events was kept separate at trial, with separate witnesses testifying as to each case and with a clear, logical presentation of evidence of the first incident on January 14 and 18, 1994, followed by evidence of the second incident on January 19, 1994. There was no legitimate concern that the jury would commingle the facts or charges stemming from these two events. See *State* v. *Jennings*, supra, 216 Conn. 658–59 (joinder of two cases proper where different witnesses testified as to each incident and both state and defendant treated cases separately by referring to different dates of each offense); *State* v. *Bell*, supra, 188 Conn. 411 (joinder proper where

evidence was not complicated and was presented in orderly manner with evidence from each incident presented in chronological order); cf. *State* v. *Horne,* supra, 215 Conn. 547–48 (joinder improper where "facial similarity between the four cases exposed the defendant to the potential prejudice that the jury would decide, cumulatively, that the defendant was responsible for a one-man crime wave of armed robberies of small stores and shops"); *State* v. *Boscarino,* supra, 204 Conn. 722–23 (joinder improper where factual similarities of four cases was so great that jury would be unable to consider evidence in each case independently).

Significantly, the two cases, although factually unrelated, are legally related. Evidence concerning the escape charge could properly have been admitted in a separate trial for the murder charge because escape indicates consciousness of guilt. *State* v. *Bell,* supra, 188 Conn. 412 ("[i]t is well established that flight of a person accused of a crime is an element which, when considered with other facts of the case, is relevant to the accused's guilt"). "Where evidence of one incident *can* be admitted at the trial of the other [incident], separate trials would provide the defendant no significant benefit. It is clear that, under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial." (Emphasis in original.) *State* v. *Pollitt,* supra, 205 Conn. 68.

Second, although we recognize that the first case involves a crime of an extremely violent nature, we do not believe that the evidence from that case compromised the jury's ability to consider fairly the charges against the defendant in the escape case. See *State* v. *Boscarino,* supra, 204 Conn. 723. In fact, the defendant confessed to both escaping from prison and assaulting the correction officer. Furthermore, while arguing during closing arguments that the state had failed to prove

the other charges against the defendant beyond a reasonable doubt, defense counsel conceded that it would take the jury "about five minutes to decide the verdict on the escape" charge. Consequently, there was no reason for the jury to confuse or intermingle the evidence with respect to these two charges. Moreover, by returning a verdict of not guilty on the charge of possession of a weapon in a correctional institution, which also stemmed from the escape incident, the jury evidently was able to separate the two cases and did not blindly condemn the defendant on his participation in the murder.

Third, the trial was not particularly complex or lengthy. In fact, the entire trial, including all testimony, closing arguments, jury instructions and jury deliberations, lasted only five days and consisted of fifteen witnesses, with the first nine addressing the murder incident and the last six addressing the escape incident. See *State* v. *Jennings*, supra, 216 Conn. 659–60 (trial lasting five days with fourteen witnesses was not unduly long or complex); *State* v. *Herring*, supra, 210 Conn. 97 (trial lasting eight days with twenty-three witnesses was not unduly long or complex); cf. *State* v. *Boscarino*, supra, 204 Conn. 723–24 (trial lasting approximately ten weeks with fifty-five witnesses was unduly long and complex).

Furthermore, we note that the trial court instructed the jury to consider separately the charges in the two informations.[23] We have previously stated that in cases

---

[23] The jury instructions provided in pertinent part: "The defendant is charged under two informations. As I've said, you will have these informations in the jury room. The first information relates to the incident of February 27 of 1992. Under this information there are four offenses charged and therefore there are four separate counts. You must render a verdict of guilty or not guilty as to each count separately.

"The second information relates to the incident of February 1 of 1993 and under this information he is charged with three offenses and these offenses are stated in three separate counts. You must render a verdict of

in which the likelihood of prejudice is not overwhelming, such as in this case, "such curative instructions may tip the balance in favor of a finding that the defendant's right to a fair trial has been preserved." *State* v. *Herring*, supra, 210 Conn. 97. Therefore, because we conclude that the defendant did not suffer substantial injustice by the joinder of the murder and escape cases, we further conclude that the trial court did not abuse its discretion in joining these two cases in one trial.

## III

The last issue that we address concerns the defendant's claim that certain statements made by the prosecutor in the rebuttal portion of the state's closing argument deprived him of a fair trial under the due process clauses of both the United States and the Connecticut constitutions.[24] The defendant argues that a handful of statements were improper in that the prosecutor "inject[ed] into argument his claims of what happens in other trials, or speculation about what would have happened had the evidence been different in this trial . . . ."[25]

---

guilty or not guilty as to each count separately in this second information also.

"Whatever your verdict is as to each of these seven counts, each of your verdicts must be unanimous. You are to consider each of these seven counts separately and determine whether or not the state has met its burden on each count."

[24] The fourteenth amendment to the United States constitution provides in relevant part that no state "shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

The constitution of Connecticut, article first, § 8, provides in relevant part that "[n]o person shall . . . be deprived of life, liberty or property without due process of law . . . ."

"Due process claims under the federal and state constitutions can be treated together because they impose similar constitutional limitations." *State* v. *Flanders*, 214 Conn. 493, 500 n.4, 572 A.2d 983, cert. denied, 498 U.S. 901, 111 S. Ct. 260, 112 L. Ed. 2d 217 (1990). Because the defendant offers no argument for separate treatment of his state constitutional claim, we will consider only his federal constitutional claim. Id.

[25] The allegedly improper statements by the prosecutor were as follows: "It's apparently okay for [the defense attorney] that his client be presumed

Although the defendant concedes that he failed to preserve this claim at trial, he argues nonetheless that his claim is reviewable either under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), because he has been deprived of a fundamental constitutional right and a fair trial,[26] or under the plain error doctrine pursuant to Practice Book § 4185.[27] We disagree.

We have previously acknowledged that prosecutorial misconduct can occur in the course of closing argu-

innocent, but . . . when it comes to the other witnesses who testified . . . they are not to be afforded the same protections. On the other cases the defense attorney stands up here and castigates the police . . . about the job they did or didn't do, now they're supposed to be perfect. . . . Not ever[y] inconsistency or contradiction means that somebody is lying . . . . Two people can look at the same thing and . . . see something a little bit differently. . . . Every time this happens in a case defense attorneys stand up here and say you can't believe anything these people have got to say, one guy says one thing, another guy says another thing, it's much too confusing, you can never convict my client of these crimes. Another case comes along and what do you know, you have three people that come in and say exactly the identical same thing, and then the defense attorney stands up and says . . . nobody ever sees the same things the same way. These people came in here and manufactured the testimony, it's all too pat, it's all too perfect, you can't convict my client. So, it's a no win situation either way. Who's kidding who?"

[26] "In *State* v. *Golding*, [supra, 213 Conn. 239–40], we reformulated the standard announced in *State* v. *Evans*, [165 Conn. 61, 327 A.2d 576 (1973)] for appellate consideration of constitutional claims that were not preserved at trial. We stated that 'a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt.' (Emphasis in original.) *State* v. *Golding*, supra [239–40]. We noted that we would remain free to dispose of the claim 'by focusing on whichever condition is most relevant in the particular circumstances.' Id., 240." *State* v. *Watlington*, 216 Conn. 188, 192, 579 A.2d 490 (1990). In this case, we conclude that the defendant has failed to satisfy the third condition of *Golding*.

[27] Practice Book § 4185 provides in relevant part: "The court on appeal shall not be bound to consider a claim unless it was distinctly raised at the

ment. *State* v. *Williams*, 204 Conn. 523, 539, 529 A.2d 653 (1987). In order to deprive a defendant of his constitutional right to a fair trial, however, the prosecutor's conduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . We do not focus alone, however, on the conduct of the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct."[28] (Citations omitted; internal quotation marks omitted.) Id., 539–40.

We have long held, moreover, that "[*Golding*] review of such a claim is unavailable where the claimed misconduct was not blatantly egregious and merely consisted of isolated and brief episodes that did not reveal a pattern of conduct repeated throughout the trial"; *State* v. *Somerville*, 214 Conn. 378, 393, 572 A.2d 944 (1990); because "in such a case the claimed misconduct is insufficient to infect the fundamental fairness of the trial itself."[29] (Internal quotation marks omitted.) *State* v. *Watlington*, 216 Conn. 188, 193, 579 A.2d 490 (1990). Furthermore, in order to warrant review under the plain error doctrine, the allegedly improper conduct must so pervade the defendant's trial as to have impaired the effectiveness or integrity of the judicial process. *State*

---

trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court."

[28] In determining whether prosecutorial misconduct is so severe as to amount to a denial of due process, we have focused on various factors, including: (1) the extent to which the misconduct was invited by defense conduct or argument; (2) the severity of the misconduct; (3) the frequency of the misconduct; (4) the centrality of the misconduct to the critical issues in the case; (5) the strength of the curative measures adopted; and (6) the strength of the state's case. *State* v. *Williams*, supra, 204 Conn. 540.

[29] The defendant bears the burden of demonstrating that his claim is a violation of a fundamental constitutional right. *State* v. *Watlington*, 216 Conn. 188, 193, 579 A.2d 490 (1990).

v. *Joyner*, 225 Conn. 450, 473, 625 A.2d 791 (1993); *State* v. *Tweedy*, 219 Conn. 489, 509, 594 A.2d 906 (1991).

Our assessment of the allegedly improper statements in light of the entire trial leads us to conclude that further review of the defendant's prosecutorial misconduct claim is unwarranted. The statements the defendant now challenges were not blatantly egregious, and, more importantly, were isolated occurrences mostly in response to comments made during the defendant's closing argument in which defense counsel attempted to attack, without any evidentiary support, the credibility of witnesses whose credibility she had chosen not to question during cross-examination.[30] Because the record does not adequately support the defendant's claim that (a) he was clearly deprived of a fundamental constitutional right and a fair trial so as to warrant review under *Golding* or (b) the effectiveness or integrity of his trial was harmed, further review of the defendant's unpreserved prosecutorial misconduct claim is unwarranted.

Because we conclude that the defendant has failed to persuade us that he is entitled to a new trial under any of his four claims, we affirm the decision of the trial court.

The judgment is affirmed.

In this opinion CALLAHAN, BORDEN and PALMER, Js., concurred.

BERDON, J., dissenting. In this case, the defendant, Darrell Atkinson, seeks to suppress the admissions he made both prior to and subsequent to being given *Miranda* warnings. The defendant argues that his pre-

---

[30] We have recognized that "the state may properly respond to inferences raised by the defendant's closing argument." *State* v. *Robinson*, 227 Conn. 711, 746, 631 A.2d 288 (1993).

warning admission should be suppressed because he was "in custody," and his postwarning admissions should be suppressed because they were tainted as a result of their temporal proximity to the prior custodial admission that was made without the benefit of *Miranda* warnings. In other words, the defendant argues that during his illegal interrogation, he let the "cat out of the bag" when he admitted he was at the murder scene, and, as a result, all subsequent admissions were presumptively tainted under the "fruit of the poisonous tree" doctrine.[1] In *Oregon* v. *Elstad*, 470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985), a majority of the United States Supreme Court rejected the "cat out of the bag" analysis discussed in *United States* v. *Bayer*, 331 U.S. 532, 540–41, 67 S. Ct. 1394, 91 L. Ed. 1654 (1947). Nevertheless, the defendant seeks to invoke the *Bayer* analysis under the state constitution.[2]

[1] The state may rebut the presumption by showing that there was "a sufficient break in the stream of events between [the] inadmissible statement and the [admission] to insulate the latter statement from the effect of what [was said] before." (Internal quotation marks omitted.) *Oregon* v. *Elstad*, 470 U.S. 298, 321, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985) (Brennan, J., dissenting); see *State* v. *Geisler*, 222 Conn. 672, 690, 610 A.2d 1225 (1992) ("evidence derived from an unlawful warrantless entry into the home [must] be excluded unless the taint of the illegal entry is attenuated by the passage of time or intervening circumstances").

[2] Utilizing the factors mentioned in *State* v. *Geisler*, 222 Conn. 672, 610 A.2d 1225 (1992), the defendant makes a persuasive argument that we should adopt, under our state constitution, the "cat out of the bag" analysis. The defendant, in his constitutional analysis, first notes that this court has determined that *Miranda* procedures have an independent significance under article first, § 8, of the state constitution. *State* v. *Ferrell*, 191 Conn. 37, 40–41, 463 A.2d 573 (1983). The defendant then highlights where, under the state constitution, we have provided greater protection against unreasonable searches and seizures. See *State* v. *Oquendo*, 223 Conn. 635, 613 A.2d 1300 (1992) (defined "seizure" in broader terms than federal law); *State* v. *Geisler*, supra, 672 (federal narrowing of exclusionary rule rejected); *State* v. *Marsala*, 216 Conn. 150, 579 A.2d 58 (1990) (refused to follow "good faith" exception to exclusionary rule); *State* v. *Derrico*, 181 Conn. 151, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980) (expressed support for "break in the stream" requirement for successive admission). Moreover, the defendant notes that Massachusetts; *Common-*

The majority refuses to reach this issue in their opinion because they claim that the defendant was not "in custody" at the time he admitted he was present at the murder scene, and therefore was not entitled to *Miranda* warnings. I respectfully disagree.

*Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), requires that a defendant be informed of certain rights before being subjected to a custodial interrogation. "By custodial interrogation, [the Supreme Court was referring to] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id., 444. A defendant is deemed to be "in custody" if there is "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." (Internal quotation marks omitted.) *California* v. *Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1990).

The United States Supreme Court has recently stated: "The ultimate 'in custody' determination for *Miranda* purposes . . . [is composed of two] discrete inquiries . . . first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson* v. *Keohane*, U.S. 116 S. Ct. 457, 465, 133 L. Ed. 2d 383 (1995). The first inquiry is distinctly factual, while the second inquiry "calls for application of the controlling legal standard to the historical facts." Id. Therefore, the determination of whether an individual is in custody "presents a 'mixed

---

*wealth* v. *Smith*, 412 Mass. 823, 593 N.E.2d 1288 (1992); New Hampshire; *State* v. *Gravel*, 135 N.H. 172, 601 A.2d 678 (1991); New York; *People* v. *Bethea*, 67 N.Y.2d 364, 493 N.E.2d 937, 502 N.Y.S.2d 713 (1986); and Tennessee; *State* v. *Smith*, 834 S.W.2d 915 (Tenn. 1992); have each rejected the holding of *Elstad.*

question of law and fact' qualifying for independent review."[3] Id.

As the Supreme Court of the United States defers to state courts regarding their factual findings; id., 464; we too must defer to the trial court's finding of facts, unless they are clearly erroneous. *State* v. *Barton*, 22 Conn. App. 62, 73, 576 A.2d 561 (1990), rev'd on other grounds, 219 Conn. 529, 594 A.2d 917 (1991). Nevertheless, like the Supreme Court, we must make an independent legal determination of whether the defendant was "in custody" based upon the facts found by the trial court. *Thompson* v. *Keohane*, supra, 116 S. Ct. 465.

The facts pertinent to this appeal are not in dispute. The police initiated contact with the defendant. In the course of investigating the murder of February 27, 1992, two plainclothes detectives went to the defendant's home and informed him that he was a suspect in a separate and distinct robbery, with no mention of the

---

[3] The majority sets forth the two part test discussed in *Thompson*, but indicates that the legal determination of custody—that is, whether a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave"—requires the court to "conduct a scrupulous examination of the record." This is confusing. We examine the record to determine whether the trial court's finding of the historical facts are supported by substantial evidence. If so, then it is the appellate court's duty, based upon those historical facts, to make an independent legal determination of whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation. Unfortunately, the language we have used in our cases on this matter has been confusing, if not incorrect. *State* v. *Greenfield*, 228 Conn. 62, 68, 634 A.2d 879 (1993) ("At the suppression hearing, the trial court determined that the defendant had not been seized at any point prior to his formal arrest. The trial court's determination was a finding of fact that will not be overturned unless it was clearly erroneous."); *State* v. *Ostroski*, 186 Conn. 287, 292, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982) ("[w]hether there has been such a seizure in an individual case is a question of fact"); *State* v. *Derrico*, 181 Conn. 151, 158, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980) (" '[p]recisely when an arrest occurs is a question of fact' ").

murder or events of February 27, 1992. The detectives asked the defendant to accompany them to the New Haven police headquarters to continue the investigation of the robbery. The defendant, who was on supervised home release, consented. The defendant was not restrained, handcuffed or frisked. Upon arriving at police headquarters, the detectives took the defendant to an interrogation room located on the third floor. There the detectives began questioning the defendant regarding the robbery. Soon thereafter, the detectives' questions turned to the felony murder that is at issue in this appeal. Although the defendant never asked to terminate the questioning or to leave, he was never informed by the detectives that he could do so. During this questioning, the defendant indicated that he was at the scene of the murder on the night of February 27, 1992. It was only after the defendant let the "cat out of the bag" that he was at the murder scene that the police decided to inform him of his *Miranda* rights. The questioning continued, and thereafter the police were able to secure a full confession from the defendant.

On the basis of the foregoing, I would find that the defendant was "in custody" from at least the time the police began to interrogate him regarding the murder. First, the defendant, by being in a supervised home release program, is "technically in legal custody continuously until his sentence has been served," and therefore should have been advised of his *Miranda* rights from the outset of the interrogation. *Oregon* v. *Mathiason*, 429 U.S. 492, 500, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977) (Stevens, J., dissenting) (interrogating person on parole). Second, given the circumstances of this case, a reasonable person placed in the situation in which the defendant found himself would not have felt free to terminate the questioning and to leave the station. The fact that the interrogation occurred at a police

station does not, in itself, require that the defendant be given *Miranda* warnings. Id., 495–96. The location of the interrogation, however, is not without significance. In this case, the defendant was taken from his home to an interrogation room on the third floor of police headquarters, a setting that could be fairly characterized as coercive.

More important than the location of the interrogation is whether the police informed the defendant that he was free to terminate the interrogation and to leave at anytime. *State* v. *Greenfield*, 228 Conn. 62, 71 n.10, 634 A.2d 879 (1993) ("[o]ften, an important factor distinguishing a consensual encounter from a seizure is whether the police expressly informed the defendant he was free to leave at the outset of the interview"). In this instance, the police never informed the defendant that he had this alternative. Moreover, the police misled the defendant into voluntarily accompanying them to the police station under the obvious subterfuge that they merely wanted to discuss a separate and distinct robbery. I doubt that the average citizen, having been taken to an interrogation room under a false expectation regarding the subject of the interrogation, would have the wherewithal and independent knowledge that he or she could terminate the questioning and leave.

Furthermore, I disagree with the majority that the fact that the police allowed the defendant to use the bathroom unaccompanied is significant. Nowhere in the record is there even a suggestion that the defendant had possessed evidence on his person that he could have destroyed or that the third floor bathroom offered access to leave the station. Finally, it is obvious to me that the police themselves thought the defendant was "in custody"; otherwise, they would not have given him his *Miranda* warnings after he let the "cat out of the bag." If he was in custody at the time *Miranda* warnings

were given, he was equally in custody before when he made the admission that he was at the murder scene because there was no change in the circumstances before or after the admission.

My conclusion that the defendant was "in custody" is further supported by the facts of *Thompson*. The facts are similar to those in this case,[4] except that in *Thompson* the accused was repeatedly told he could leave the police station at any time. *Thompson* v. *Keohane*, supra, 116 S. Ct. 461. Notwithstanding these facts, a majority of the United States Supreme Court refused to find that the incorrect standard applied by the state court constituted harmless error. Id., 467. In other words, the majority refused to hold, as a matter of law, that Thompson was not in custody.[5] Also, the factual scenario in *Elstad*, where the state conceded custody, underscores the conclusion that the defendant in this case was "in custody."[6]

---

[4] In *Thompson*, the defendant came to the state police headquarters at the request of a state trooper for the purpose of identifying some personal items that the trooper thought belonged to the defendant's wife. *Thompson* v. *Keohane*, supra, 116 S. Ct. 460. The trooper's primary reason for contacting the defendant, however, was to question him about a murder. Id. Once the defendant arrived at the station, he was questioned for over two hours by two unarmed troopers in a small interview room. Id., 461. The troopers did not inform the defendant of his *Miranda* rights, although they did constantly inform the defendant that he was free to leave. Id. During the interrogation, the troopers told the defendant "that they knew he killed his wife . . . that execution of a search warrant was underway at his home, and that his truck was about to be searched pursuant to another warrant . . . ." Id.

[5] Justice Clarence Thomas, in his strongly worded dissent, in which Chief Justice Rhenquist joined, wrote that he would have held, as a matter of law, that Thompson was not in custody: "Because Thompson cannot establish a *Miranda* violation even under de novo review, I would resolve that question now . . . ." *Thompson* v. *Keohane*, supra, 116 S. Ct. 470.

[6] In *Oregon* v. *Elstad*, supra, 470 U.S. 298, the state conceded the issue of custody based upon the following facts: The police arrived at the defendant's home to question him regarding a recent burglary. The defendant's mother answered the door and led the officers to the defendant's room. The officers asked the defendant to get dressed and to accompany them into the living room. Before the defendant had been informed of his *Miranda* rights, one

The state argues that this case is similar to our recent case of *State* v. *Greenfield*, supra, 228 Conn. 62, wherein we held that the defendant was not in custody for purposes of determining whether there was a seizure under *State* v. *Oquendo*, 223 Conn. 635, 613 A.2d 1300 (1992). I must confess, as the author of the *Greenfield* opinion, the facts and analysis of *Thompson* render the determination of whether Greenfield was "in custody" a closer call than we indicated at the time of that decision. The defendant in *Greenfield*, however, conceded that he was not seized until the police left the interrogation room and closed the door. *State* v. *Greenfield*, supra, 69–70. This concession became a focal point of our analysis, to which we responded, "we fail to see how this pause in the interrogation took on the coercive significance the defendant ascribes to it." Id., 72. Furthermore, the facts of *Greenfield* are distinguishable in that the defendant there returned to the crime scene and approached the police, unlike the defendant in the present case with whom the police initiated contact.

Accordingly, I would not only conclude that the defendant's initial admission that he was at the crime scene must be suppressed, but I would also reach the issue of whether the defendant's subsequent statements given to the police after he received his *Miranda* warnings should be suppressed under our state constitution as a result of his letting the "cat out of the bag." See *Oregon* v. *Elstad*, supra, 470 U.S. 318 (Brennan, J., dissenting); *State* v. *Shifflett*, 199 Conn. 718, 740, 508 A.2d 748 (1986); *State* v. *Derrico*, 181 Conn. 151, 165–67, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980).

I respectfully dissent.

---

of the officers began to question him. During that questioning the defendant admitted to participating in the burglary. Id., 300–301.