STATE OF CONNECTICUT *v.* LUCIS RICHARDSON
(AC 19530)

Landau, Flynn and O'Connell, Js.

Argued June 12—officially released November 6, 2001

726

*Richard Hustad Miller*, special public defender, for the appellant (defendant).

*Bruce R. Lockwood*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *John F. Fahey*, assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant, Lucis Richardson, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (3)[1] and 53a-49 (a) (2),[2] and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a)[3] and 53a-134 (a) (3).[4] On appeal, the defendant

---

[1] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery . . . or of immediate flight therefrom, he or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument . . . ."

[2] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[3] General Statutes § 53a-48 (a) provides in relevant part: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[4] See footnote 1.

claims that his conviction is fatally flawed because (1) the standard of review applied in this state for review of a custody determination under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), fails to comply with the standard set by the United States Supreme Court in *Thompson* v. *Keohane*, 516 U.S. 99, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995), (2) he was in the custody of the police at the time that he gave them a written, signed statement on February 24, 1996, and, thus, was entitled to *Miranda* warnings, (3) there was insufficient evidence to establish that he knew that his alleged coconspirator was armed with a dangerous instrument and (4) there was insufficient evidence to establish that the defendant intended to use a drill as a dangerous instrument. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Colin Williams, a Hartford taxicab driver, was stabbed on Martin Street in the early morning hours of February 24, 1996. On the prior evening of February 23, the defendant, along with Danixsa Sanchez, Robin Ledbetter and Phillip Milling were together at the apartment of the defendant's aunt, which also is on Martin Street in Hartford, when the defendant asked Ledbetter "if she was down" to rob a taxicab driver that night. She replied, "[Y]eah." The defendant and Ledbetter wanted to rob a taxicab driver who had been working for a while after the shift change because he would then have more fares. Ledbetter, after calling the taxicab company to find out when the shift changed, waited until 1:30 a.m. and then called for a taxicab, giving the defendant's telephone number as the callback number. Ledbetter armed herself with a ten inch knife, which she secured in her pants leg with the aid of a bandanna. The defendant armed himself with a drill that he told Sanchez looked like a gun and that he would use to put to the driver's head when demanding money.

At about 2 a.m., while the defendant and Ledbetter went outside to wait for the taxicab, Michael Grate, a gymnasium assistant at Quirk Middle School walked by them. Recognizing the defendant as a former student, Grate asked the defendant what he was doing out so late and warned him to stay out of trouble. When the taxicab arrived, Ledbetter and the defendant entered the vehicle. The defendant then put the drill to the driver's head while demanding money. When the driver grabbed Ledbetter, she stabbed the driver with the long knife. The defendant and Ledbetter then returned to the apartment. The victim was found shortly after 2 a.m. by the police. He was transported by ambulance to Saint Francis Hospital and Medical Center, where he died about one and one-half hours later.

At about 5 a.m., Hartford police officers interviewed the defendant at his home after tracking down the location of the callback number to the Martin Street apartment, where the defendant lived. The defendant told the police that he knew nothing about the murder but that two others, whom he identified as "the Joker" and "Robin" Ledbetter, had been visiting at his apartment just a few hours earlier. The police then left.

Later that afternoon, at about 4:30 p.m., three officers returned to the defendant's apartment. They asked the defendant, in the presence of his aunt, if he would be willing to come with them to the police station to provide them with more information about the people he had earlier identified as Joker and Robin, and with any other information he might have about the robbery and murder of the taxicab driver. The police assured the defendant that he was not a suspect, but merely a witness. At the encouragement of his aunt, the defendant agreed to go to the police department with the officers to tell them what he knew. The defendant rode to the station, along with the three officers, in the backseat

of an unmarked police car. His aunt did not accompany him.

Upon arrival at the police station, the defendant was taken to an interrogation room, which the police termed "the suite" because it was equipped with a bathroom. An officer remained with the defendant the entire time that he was at the station. While he was at the station, the defendant looked at an array of photographs and, in further interviews there, gave the police an oral statement implicating Ledbetter and Joker, who later was identified as Milling, as the persons who had attempted to rob the taxicab driver. He also indicated that along with Ledbetter and Milling, his girlfriend, Sanchez, also was present at his home that night. The defendant provided the police with Sanchez' telephone number. The police called Sanchez, then went to pick her up and drive her to the station for questioning about the events of the previous evening. At some point during that evening, the defendant's statement implicating Ledbetter and Milling was reduced to writing by the officers and signed by the defendant. Sanchez also gave a statement implicating Ledbetter and Milling. In contrast, Sanchez admitted at trial that it was the defendant and Ledbetter who had attempted to rob the taxicab driver. At about 11 p.m., after the defendant gave his statement, he was taken home by the police. It is undisputed that the statements that the defendant gave to the police on February 24, were not preceded by any *Miranda* warnings.

Ultimately, on February 26, the police interviewed Ledbetter, who not only confessed to commission of the crimes, but told the police that it was the defendant who had committed the crimes with her and not Milling, whom the defendant wrongfully had accused.

On February 29, the defendant waived his *Miranda* rights and gave a fully voluntary statement to the police,

in which he confessed to his involvement in the crime, describing how he and Ledbetter wanted money, and how he had used the drill by putting it behind the driver's head and then using it to hit him. He then detailed how Ledbetter stabbed the driver.

Prior to trial, the defendant filed a motion to suppress all oral and written statements he had allegedly made to the police, together with any fruits thereof. At a pretrial suppression hearing, the court denied the motion. In its oral memorandum of decision, the court made only limited factual findings and, although the court did not explicitly conclude that the defendant was not in custody at the time that he made the statements, that determination is implicit in light of the fact that the court denied his motion to suppress. At trial, the state introduced both the defendant's February 24 and February 29 statements, and the testimony of Sanchez and Milling as part of its case-in-chief.

I

The defendant's first claim is that the standard of review applied in this state for appellate review of a determination of custody for purposes of *Miranda* fails to comply with the minimum protections required by the United States Supreme Court in *Thompson* v. *Keohane*, supra, 516 U.S. 112–14. We disagree and conclude that they are in harmony.

Our Supreme Court recently articulated the proper scope of appellate review of a trial court's determination of custody and has expressly determined that the standard we apply in our review satisfies the requirements of *Thompson* v. *Keohane*, supra, 516 U.S. 112–14. *State* v. *Pinder*, 250 Conn. 385, 411–12, 736 A.2d 857 (1999). "As [our Supreme Court] stated in *State* v. *Atkinson*, 235 Conn. 748, 759 n.17, 670 A.2d 276 (1996), [o]ur review of the issue of custody comports with the United States Supreme Court's recently enunciated two part

test for determining custody. Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. . . . The first inquiry . . . is distinctly factual. . . . The second inquiry, however, calls for application of the controlling legal standard to the historical facts. This ultimate determination, we hold, presents a mixed question of law and fact qualifying for independent review. *Thompson* v. *Keohane*, [supra, 112–13]." (Internal quotation marks omitted.) *State* v. *Pinder*, supra, 410. With that scope of review in mind, we turn to the defendant's custody claim.

## II

The defendant's next claim is that the court improperly denied his motion to suppress because he was in custody during the February 24, 1996 interrogation during which he gave his first statement. Furthermore, the defendant claims that if this court concludes that his February 24 statement was rendered inadmissible because it was taken in violation of his *Miranda* rights, then the court must necessarily conclude that the defendant's second, February 29 statement and any other evidence that the police discovered solely as a result of his February 24 statement, including any evidence supplied by the statements of Ledbetter, Sanchez and Milling, also were inadmissible. Finally, the defendant argues that the court's improper admission of the statements at issue here was not harmless error because those statements constituted almost the entire case against him.

The state argues that the defendant was not in custody on February 24, and, therefore, *Miranda* warnings were not warranted. In the alternative, the state argues that even if the defendant's February 24 statement was admitted improperly, that error was harmless beyond a

reasonable doubt in light of the defendant's subsequent February 29 untainted confession. We agree with the state's latter argument and affirm the judgment of the trial court.

## A

We first address the defendant's claim that the court improperly determined that he was not in custody at the time of his February 24, 1996 statement and, therefore, *Miranda* warnings were not warranted. We assume without deciding that the defendant was in custody when he made the February 24 written statement and conclude that the issues that the defendant raises are resolved by the February 29 statement, which was taken following administration of *Miranda* warnings, and the other facts and circumstances surrounding his arrest.

## B

The defendant also claims that if his February 24 statement was taken in violation of *Miranda* and, therefore, should have been excluded, then this court must also conclude that any evidence that flowed from that statement should also have been excluded. We disagree.

Our assumption that the court should have suppressed the defendant's February 24 statement because it was the product of a *Miranda* violation does not dictate that we conclude that the court should have suppressed or excluded the defendant's February 29 confession or any of the evidence obtained as a result of the statements of Ledbetter, Sanchez and Milling. We conclude that the admissibility of such derivative evidence turns not on whether the defendant's February 24 statement was the result of a *Miranda* violation but, rather, on whether the February 24 statement was involuntary or prompted by coercion. We discuss, in turn, the admissibility of the defendant's February 29 statement and the evidence from the other witnesses.

First, the defendant claims that his February 29 confession indirectly was compelled by the illegally obtained statement that he gave to the police on February 24 and, therefore, the February 29 statement is tainted with the illegality of his February 24 statement and should have been excluded. The defendant's claim, in essence, is a variation on "the cat out of the bag" theory announced in *United States* v. *Bayer*, 331 U.S. 532, 540–41, 67 S. Ct. 1394, 91 L. Ed. 1654 (1947). In propounding his variant of "the cat out of the bag" confession, the defendant's counsel has raised a substantial issue that we now address.

The defendant claims that it was his February 24 statement that led the police to Ledbetter, who ultimately implicated him in the attempted robbery. He further claims that it was Ledbetter's statement that precipitated his February 29 confession because at that point "the cat was out of the bag." He argues that because his February 29 statement stems from his February 24 statement, therefore the later, February 29 statement must be excluded as well. We disagree.

"Certainly, all admissions or confessions which follow invalid confessions are not a result of the prior confession." *State* v. *Darwin*, 161 Conn. 413, 425, 288 A.2d 422 (1971). "In *Oregon* v. *Elstad*, [470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985)] the United States Supreme Court held that, under the United States constitution, the initial failure to administer *Miranda* warnings to a suspect who voluntarily provides an incriminating statement, in the absence of actual coercion by law enforcement officers, does not taint any subsequent admissions that are made after the suspect has been fully advised of and has waived his *Miranda* rights." *State* v. *Atkinson*, supra, 235 Conn. 756 n.15. "*Elstad* draws a distinction between the simple failure to administer the warnings, unaccompanied by any actual coercion . . . and more serious *Miranda* viola-

tions where the police have employed improper tactics or inherently coercive methods that are calculated to undermine the suspect's ability to exercise his free will." (Citation omitted; internal quotation marks omitted.) *State* v. *Shifflett*, 199 Conn. 718, 741, 508 A.2d 748 (1986). Thus, "failure to administer the warnings, unaccompanied by any actual coercion . . . [does not] so [taint] the investigatory process that a subsequent voluntary and informed waiver is ineffective . . . . Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." (Internal quotation marks omitted.) *State* v. *Atkinson*, supra, 756–57 n.15.

In the present case, the defendant has not argued that the Hartford police engaged in any improper conduct that was calculated to break his ability to exercise free will when he gave his February 24 statement. Instead, the defendant simply argues that the February 24 statement should have been suppressed because it was not preceded by *Miranda* warnings. Further, the defendant's subsequent statement, made five full days after his February 24 statement, was made after a proper administration of *Miranda* warnings and a knowing and voluntary waiver of *Miranda* rights, as evidenced by the defendant's signature on the advisement of rights form, as well as the testimony of those who witnessed the defendant sign the advisement form on February 29. Accordingly, we conclude that the defendant's February 29, 1996 statement properly was admitted.

Second, the defendant claims that any evidence that the police learned about as a result of Ledbetter's statement, as well as the statements of Sanchez and Milling, should have been suppressed because the police learned of the identities of those witnesses exclusively

through the information provided in his February 24 statement. Again, we disagree.

In *Michigan* v. *Tucker*, 417 U.S. 433, 445–51, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974), the United States Supreme Court rejected the argument that absent coercion on the part of the police, all evidence, including the statement of a witness, whose identity the defendant had revealed while in custody, should be excluded as "fruits" of a *Miranda* violation. Although we have already assumed without deciding that the defendant's February 24 statement may have been the product of a *Miranda* violation, we have determined that it was not the product of a fifth amendment violation arising out of coercion or other improper tactics on the part of the police. Accordingly, we conclude that the evidence that was introduced at trial, which was derived in part from the witnesses identified by the defendant in his February 24, 1996 statement, properly was admitted.

C

We now turn to the issue of whether the court's failure to suppress the defendant's February 24, 1996 statement constituted harmless error. The state contends that even if it was error to admit the defendant's February 24 statement at trial because it was taken in violation of *Miranda*, that error was harmless. We agree.

"The improper admission of a confession is harmless error where it can be said beyond a reasonable doubt that the confession did not contribute to the conviction. . . . [Our Supreme Court] has held in a number of cases that when there is independent overwhelming evidence of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Hafford*, 252 Conn. 274, 297, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000).

In the present case, there was overwhelming evidence of the defendant's guilt independent of his February 24 statement, namely, his properly admitted February 29 confession. Furthermore, his home telephone number was used to call the taxicab company and was given as the callback number. In addition, the testimony of Sanchez, Milling and Grate corroborated the defendant's account of what occurred in the early morning hours of February 24 and was further evidence of guilt. We also note that prior to the February 24 written statement, which the defendant gave to the police at the station, he orally told the officers who came to his home about Robin and Joker. Certainly, the defendant was not in custody when he answered the officers' preliminary questions while in his home, and it is inconceivable that in the course of a murder investigation, the police would not have tracked down and contacted those individuals whom he named, even without the defendant's later, February 24 written statement. We conclude that any error in admitting the defendant's February 24, 1996 statement was harmless beyond a reasonable doubt.

### III

We next turn to the defendant's claims of insufficiency of the evidence relating to the crimes of attempt to commit robbery in the first degree and conspiracy to commit robbery in the first degree. Because some of the same evidence applies to both claims, we address the two remaining claims together.

The defendant contends that the evidence was insufficient to sustain a verdict of guilty of conspiracy to commit robbery in the first degree in that there was no evidence that he had intended that anyone committing the robbery would be armed with a dangerous instrument. The long form information dated November 13, 1998, included a count four that charged that the defen-

dant had committed the crime of conspiracy to commit robbery in the first degree in violation of §§ 53a-48 (a) and 53a-134 (a) (3), and that on February 24, 1996, "the defendant, with intent that conduct constituting the crime of robbery in the first degree be performed, agreed with Robin Ledbetter to engage in or cause the performance of such conduct, and either one of them committed an overt act in pursuance of such conspiracy."

Our Supreme Court has set out the applicable appellate standard of review for sufficiency of evidence claims. "In reviewing [a] sufficiency [of the evidence] claim, we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994), quoting *State* v. *Greenfield*, 228 Conn. 62, 76, 634 A.2d 879 (1993).

Under the governing statutes, "[a] person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." General Statutes § 53a-133. A person has committed robbery in the first degree if, "in the course of the commission of the crime . . . he or another participant in the crime . . . uses or threatens the use of a dangerous instrument. General Statutes § 53a-134 (a) (3).

"The use or threatened use of immediate physical force is the element which distinguishes larceny from robbery. *State* v. *Childree*, 189 Conn. 114, 123, 454 A.2d 1274 (1983). [I]f the use of force occurs during the continuous sequence of events surrounding the taking . . . even though some time immediately before or after, it is considered to be in the course of the robbery . . . within the meaning of the statute." (Internal quotation marks omitted.) *State* v. *Crosswell*, 223 Conn. 243, 250–51, 612 A.2d 1174 (1992); *State* v. *Ghere*, 201 Conn. 289, 297, 513 A.2d 1226 (1986).

As applied to the defendant's contentions in this case, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the defendant had intended that either he or Ledbetter would be armed with a dangerous instrument. See, e.g., *State* v. *Hallowell*, 61 Conn. App. 463, 466–67, 766 A.2d 950 (2001); *State* v. *Boykin*, 27 Conn. App. 558, 563–64, 609 A.2d 242, cert. denied, 223 Conn. 905, 610 A.2d 179 (1992). We conclude that the jury reasonably could have found that the defendant intended that either he or Ledbetter, or both, would be armed with a drill and knife, respectively. The defendant in his reply brief concedes that "there is no question that an agreement had been made between the defendant and Ms. Ledbetter." He contends, however, that there was no evidence that the '*contents*' of the conspiracy included the use of the drill as a dangerous instrument. We first note that the defendant is attempting to define the scope of the conspirators' agreement by connecting it only to the events that occurred before the actual forceful taking of the taxicab driver's money. We also point out that the information included an intent that either the defendant or Ledbetter be armed with a dangerous instrument.

"[T]he existence of a formal agreement between the conspirators need not be proved. *State* v. *Johns*, 184

Conn. 369, 378, 439 A.2d 1049 (1981) . . . ." (Citation omitted.) *State* v. *Ghere*, supra, 201 Conn. 299. "[C]onspiracy can seldom be proved by direct evidence but may be inferred from acts done [by the accused persons]." *State* v. *Faillace*, 134 Conn. 181, 185, 56 A.2d 167 (1947). Here, the jury could look to Ledbetter's use of the knife to penetrate the taxicab driver's chest, and the defendant's use of the drill to threaten and to beat the victim. It also was entitled to consider the evidence that each of them witnessed the other arming himself or herself with those weapons prior to leaving to commit the robbery.

"It is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. The combination or confederation may be proved by circumstantial evidence, that is, by proof of the separate acts of the individuals accused and by proof of circumstances from which the illegal confederation may be inferred. *State* v. *Gerich*, 138 Conn. 292, 297, 83 A.2d 488 [1951]. *State* v. *Holmes*, 160 Conn. 140, 150, 274 A.2d 153 (1970). *State* v. *Baker*, 195 Conn. 598, 604, 489 A.2d 1041 (1985)." (Internal quotation marks omitted.) *State* v. *Ghere*, supra, 201 Conn. 299.

There was no direct evidence of the entire agreement to rob the taxicab driver by using a dangerous instrument. There was, nonetheless, circumstantial evidence before the jury from which, as a rational trier of fact, it could have found that both the defendant and Ledbetter intended to force the driver to give up his money, the defendant, by the use of a drill that he first held to the driver's head and then used to hit the driver on the head, and Ledbetter, by the use of a long knife that she used repeatedly to stab the victim while the defendant held him.

The jury had evidence of the defendant's statement to his girlfriend, Sanchez, that he would put the drill to

the driver's head when demanding money. Ultimately, in committing the crime, he did so, following that act by beating the driver on the head with the drill. The defendant's own February 29, 1996 confession notes that Ledbetter, who was in the same apartment, armed herself with a long ten inch knife, wrapping it in a bandanna that she secured to her leg. Ultimately, there was evidence of her use of that knife during the robbery to stab the taxicab driver, who was left bleeding in his taxicab. A jury is permitted to draw an inference. The jury permissibly could draw an inference from the defendant's and Ledbetter's words, and their individual arming of themselves, which took place in one another's presence at the apartment, that they intended to cooperate to rob a taxicab driver. To accomplish that, they would use the drill and knife, both dangerous instruments, to compel the driver to deliver up his money and to prevent or overcome any resistance on his part. A conspiracy can be inferred from the facts and circumstances of the case. *Iannelli* v. *United States*, 420 U.S. 770, 95 S. Ct. 1284, 43 L. Ed. 2d 616 (1975); see also 2 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 6.4 (e), p. 71. We conclude that there was adequate evidence before the jury to warrant inferences that both the defendant and Ledbetter had agreed and intended to use dangerous instruments in committing the robbery.

The judgment is affirmed.

In this opinion the other judges concurred.