STATE OF CONNECTICUT *v.* STEVE D. NELSON
(AC 27541)

Gruendel, Lavine and Mihalakos, Js.

---

Argued October 16, 2007—officially released January 22, 2008

*David J. Reich*, special public defender, for the appellant (defendant).

*Harry D. Weller*, senior assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Brian Preleski*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Steve D. "Sticky" Nelson, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a)[1] and 53a-134 (a) (3).[2] On appeal, the defendant claims that (1) there was insufficient evidence to support a finding of guilty of conspiracy to commit robbery in the first degree, (2) the trial court improperly admitted an audio recording of a 911 call under the spontaneous

[1] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[2] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument . . . ."

utterance exception to the hearsay rule, (3) the court improperly admitted the same recording to accredit witness testimony, (4) the court improperly instructed the jury that it could use out-of-court statements to accredit witness testimony and (5) the prosecutor committed improprieties during final argument to the jury. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On January 22, 2005, after a day of heavy snowfall, the defendant and another man, both armed and masked, broke into the Wethersfield apartment of Lincoln Marshall and assailed him. The defendant and his cohort bound Marshall's hands and feet and duct taped his face. Marshall was able to see somewhat with his right eye, which was not completely covered by the tape. The assailants beat Marshall, accosted him for money and rummaged through his apartment. They took Marshall's wallet, which contained $400, and demanded more money. After heating on Marshall's stove a knife that they found in his kitchen, the men repeatedly burned him with the knife so that he would tell them where he kept his money. They threatened to kill him. Marshall offered to collect money owed to him from a Hartford man named Brian. The assailants forced Marshall outside and into his car. They also placed in Marshall's car and another car approximately $12,000 worth of property they had removed from the apartment. When the defendant removed his mask, Marshall recognized him as Sticky Nelson, a local man from whom Marshall had purchased a car.

After binding Marshall's ankles again and placing him in the backseat of his car, the defendant and his cohort drove Marshall to Brian's house to collect the debt, but Brian was not home. They next drove to the defendant's residence, where they removed from the car items that they had taken from Marshall's apartment. At this location, another man beat Marshall and threatened to kill

him if he did not provide money. Finally, the men drove Marshall to Weaver High School in Hartford, where they untied his hands and left him with his cellular telephone, on which they had dialed 911 for him. They drove away in another vehicle after one of them told Marshall: "If you come out, we're going to shoot you."

Marshall informed the 911 operator that he was tied up, bleeding and in need of help. He told the operator that he knew one of the assailants, the defendant, and that the assailants were driving a black or dark blue Acura Legend. In response to the call, Officer Matthew Labbe of the Hartford police department arrived at Weaver High School, where he found a very frightened Marshall, ankles bound, in the backseat of his car. Labbe transported Marshall to a hospital, where he was treated for his injuries and later released. Detective Michael Patkoske of the Wethersfield police department led the investigation. On January 26, 2005, Marshall identified the defendant's photograph in an array shown to him by the police.

The state charged the defendant with two counts of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A) and (B), two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3) and (4), assault in the first degree in violation of General Statutes § 53a-59 (a) (1), two counts of burglary in the first degree in violation of General Statutes § 53a-101 (a) (1) and (2), larceny in the first degree in violation of General Statutes § 53a-122 (a) (2) and conspiracy to commit robbery in the first degree in violation of §§ 53a-48 (a) and 53a-134 (a). After a jury trial, the defendant was convicted of conspiracy to commit robbery in the first degree[3] and

---

[3] The court instructed the jury in relevant part: "In this [ninth] count, [the state] must prove beyond a reasonable doubt, therefore, that when he made such agreement with another person, the defendant had the specific intent to wrongfully take property from Marshall and "to permanently deprive him of his property or to permanently appropriate it to himself or to a third

was sentenced to a term of eighteen years imprisonment. This appeal followed.

## I

The defendant first claims that there was insufficient evidence to support finding him guilty of conspiracy to commit robbery in the first degree with a dangerous instrument because the state failed to prove that he had planned prior to the robbery to use a knife during the robbery. More particularly, the defendant contends that to be guilty of a conspiracy to commit robbery in the first degree, he would have to have conspired to use the knife before entering Marshall's premises. We disagree.

Our standard of review for a sufficiency of evidence claim is well established. "In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because [our Supreme Court] has held that a [trier's]

person by the use of physical force, and he further intended that during the robbery he or another person would use a dangerous instrument; to wit, a knife."

factual inferences that support a guilty verdict need only be reasonable." (Internal quotation marks omitted.) *State* v. *Farnum*, 275 Conn. 26, 32, 878 A.2d 1095 (2005). "In conducting our review, we are mindful that the finding of facts, the gauging of witness credibility and the choosing among competing inferences are functions within the exclusive province of the jury, and, therefore, we must afford those determinations great deference." *State* v. *Conde*, 67 Conn. App. 474, 490, 787 A.2d 571 (2001), cert. denied, 259 Conn. 927, 793 A.2d 251 (2002).

"A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; *or (3) uses or threatens the use of a dangerous instrument;* or (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . ." (Emphasis added.) General Statutes § 53a-134 (a). "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy." General Statutes § 53a-48 (a).

"To sustain a conviction under § 53a-48 (a), the state needs to prove beyond a reasonable doubt (1) that a defendant intended that conduct constituting a crime be performed [and] (2) that he agreed with one or more persons to engage in or cause the performance of such conduct . . . ." (Internal quotation marks omitted.) *State* v. *Duncan*, 96 Conn. App. 533, 541, 901 A.2d 687,

cert. denied, 280 Conn. 912, 908 A.2d 540 (2006). "[T]he existence of a formal agreement between the conspirators need not be proved . . . ." (Internal quotation marks omitted.) Id. Rather, "[a] conspiracy can be inferred from the facts and circumstances of the case." *State* v. *Richardson*, 66 Conn. App. 724, 740, 785 A.2d 1209 (2001).

In this case, Marshall testified that the defendant and his cohort heated a knife and, as they demanded money, used it to burn Marshall on his nose, forehead, stomach and back. The fact that the assailants found the knife in the apartment fails to demonstrate the defendant's lack of intent to participate in this course of action. As long as the defendant had time to reflect and to deliberate on his actions, he can be held culpable for the requisite specific intent to commit a crime. See *State* v. *Brown*, 161 Conn. 219, 222, 286 A.2d 304 (1971). From Marshall's testimony and other corroborating evidence, including Patkoske's testimony that a kitchen knife was found near Marshall's couch, the jury reasonably could have inferred that the defendant conspired to use the knife during and in furtherance of the robbery. "It is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. The combination or confederation may be proved by circumstantial evidence, that is, by proof of the separate acts of the individuals accused and by proof of circumstances from which the illegal confederation may be inferred." (Internal quotation marks omitted.) *State* v. *Richardson*, supra, 66 Conn. App. 739.

The evidence in this case manifests the defendant's complicity in robbery with a dangerous instrument. We therefore conclude that the evidence was sufficient to

support a verdict of guilty of conspiracy to commit robbery in the first degree.

## II

The defendant next claims that the court improperly admitted the recording of the 911 call, which includes Marshall's description of his injuries, as well as his identification of the defendant, under the spontaneous utterance exception to the hearsay rule. Pursuant to § 8-3 (2) of the Connecticut Code of Evidence, a spontaneous utterance is "[a] statement relating to a startling event or condition made while the declarant was under stress of excitement caused by the event or condition."[4] The defendant alleges that Marshall's 911 statements should not have been admitted as a spontaneous utterance because (1) Marshall did not have an opportunity to observe the events leading to the statements he made to the 911 operator and (2) Marshall was not under the stress of circumstances required for the spontaneous utterance exception when he made the statements at issue. We disagree.

## A

The defendant claims that Marshall's 911 call should not have been admitted as a spontaneous utterance hearsay exception because Marshall did not have an opportunity to observe the events leading to the spontaneous utterance.[5] Specifically, the defendant argues that

---

[4] The defendant additionally claims that the court improperly ruled that the 911 tape was admissible as a nontestimonial statement. Even if Marshall's statements were testimonial, as the defendant suggests, their admission would not be barred by the confrontation clause, which "does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Crawford* v. *Washington*, 541 U.S. 36, 60 n.9, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Because Marshall testified at trial and was cross-examined by the defendant, we need not address the issue of whether the statements he made during the 911 call were testimonial.

[5] The tape of the 911 call was admitted as a full exhibit and states:
"[911 Operator]: . . . May I help you?
"[Marshall]: Yes, I've been tied up and robbed. I'm at Granby Street. Please send help.
"[911 Operator]: Where are you?

"[Marshall]: Granby Street behind a school somewhere. . . . They said I'm on Granby Street. I'm still tied up, behind a high school. I think they said something like weave. Help.

"[911 Operator]: You're outside?

"[Marshall]: They locked me up in my car.

"[911 Operator]: They locked you up in your car?

"[Marshall]: Please send help quick.

"[911 Operator]: Who locked you up in your car?

"[Marshall]: Four men. . . .

"[911 Operator]: Four men. Do you know them?

"[Marshall]: No.

"[911 Operator]: Did they assault you in any way?

"[Marshall]: Yes, they burned and cut me. . . .

"[911 Operator]: You're bleeding from what part of your body?

"[Marshall]: My head.

"[911 Operator]: Your head?

"[Marshall]: It's all over my face and my head right now. Please send help.

"[911 Operator]: What is your name?

"[Marshall]: My name is Lincoln. . . .

"[911 Operator]: And do you know any of these men that did this to you?

"[Marshall]: No, but—no, please help. Help.

"[911 Operator]: How long have you been out there?

"[Marshall]: I've been—they've been driving me around five, six hours now. I don't know.

"[911 Operator]: What kind of car are you in?

"[Marshall]: A blue X-5.

"[911 Operator]: In a blue X-5?

"[Marshall]: Yes.

"[911 Operator]: Is that your vehicle?

"[Marshall]: Yes.

"[911 Operator]: Where do you live?

"[Marshall]: I live in Wethersfield.

"[911 Operator]: In Wethersfield. Do you want to stay on the phone with me until I get officers there?

"[Marshall]: Yes. Please hurry up.

"[911 Operator]: Okay. I will send the officers to you, and I will send an ambulance also. Okay?

"[Marshall]: Yes.

"[911 Operator]: And they took you from Wethersfield into Hartford or did it happen—

"[Marshall]: Yes.

"[911 Operator]: —you were in Wethersfield when they brought you into Hartford?

"[Marshall]: I couldn't see anything. I'm trying. Oh God. They took the key to the van.

"[911 Operator]: These men, were they black, white or Hispanic?

"[Marshall]: Black. They were all black. I saw some of their faces and they were calling each other names. They have my Nextel phone. Maybe you can track it. . . .

"[911 Operator]: Whose phone are you using now?

"[Marshall]: My phone. I have two cell phones. . . .

"[911 Operator]: You met these people in Hartford?

"[Marshall]: No, they were at my apartment waiting for me.

"[911 Operator]: Where do you live . . . in Wethersfield?

"[Marshall]: Yes. . . . Let me see. I'm trying to open the door.

"[911 Operator]: It's very cold out there. Don't open the car door.

"[Marshall]: I can't see. Wait. I'm trying to see. I don't see any name on this school.

"[911 Operator]: That's Weaver High School if you're on Granby Street.

"[Marshall]: It says Weaver [High School]. . . . Tell them there's a van parked beside me, too.

"[911 Operator]: Okay. So, you're parked on the side of Weaver High School, then, if you can see the name of the school?

"[Marshall]: No, I can see the—I can see the garbage can. Oh, gosh.

"[911 Operator]: Stay in your vehicle because it's cold out there. Get back in your car. Are you back in your car?

"[Marshall]: Yes.

"[911 Operator]: Stay in there, please. There's a cruiser on the way. I'm still here. . . . I also got the ambulance and fire department on the way to help you.

"[Marshall]: Okay. I got the tape off my face. Oh, God. They burned me up real bad. Oh, God.

"[911 Operator]: And you're bleeding from your face, you said?

"[Marshall]: They burned me with a knife in my head and they cut me— they burned me on my stomach. It just burns.

"[911 Operator]: They burned you with a knife?

"[Marshall]: Yeah . . . .

"[911 Operator]: And you don't know any of these guys?

"[Marshall]: I recognize one of them because they duct taped my face and my eye. I could see one of them.

"[911 Operator]: Uh-huh.

"[Marshall]: And they called him—they called his name, too.

"[911 Operator]: What did they call him?

"[Marshall]: Sticky. . . .

"[911 Operator]: Sticky?

"[Marshall]: Yes.

"[911 Operator]: And they were driving your car, and then they took off.

"[Marshall]: They were driving—I seen the car that they came—

"[911 Operator]: What kind of car was it?

"[Marshall]: Acura Legend. I couldn't see the license plate, but I know the street where they took me because I could see out of one of my eyes.

"[911 Operator]: And what color was the Acura?

"[Marshall]: I think it was either black or blue. It was real dark.

"[911 Operator]: Dark. And you don't recall any of the letters or the numbers on the plate?

"[Marshall]: I couldn't see any. It was snowing still.

"[911 Operator]: So, this must have been five o'clock or six o'clock when they picked you up?

"[Marshall]: I'd say about six o'clock.

"[911 Operator]: About six o'clock. I have an officer there.

"[Marshall]: I don't see any police. . . .

"[911 Operator]: Stay right there. I have officers there. They're just looking for you at this point. Okay. Anyway can you blow your horn?

"[Marshall]: Yes.

"[911 Operator]: He's going to blow his horn so they can find him.

"[Marshall]: It's not blowing.

"[911 Operator]: It's not blowing?

"[Marshall]: No.

because Marshall's eyes were covered with duct tape, Marshall could not have observed the defendant.

"An out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies." (Internal quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 127, 763 A.2d 1 (2000). "The excited utterance exception [to the hearsay rule] is well established. Hearsay statements, otherwise inadmissible, may be admitted into evidence to prove the truth of the matter asserted therein when (1) the declaration follows a startling occurrence, (2) the declaration refers to that occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant. . . . Whether an utterance is spontaneous and made under circumstances that would preclude contrivance and misrepresentation is a preliminary question of fact to be decided by the trial judge. . . . The trial court has broad discretion in making that factual determination, which will not be disturbed on appeal absent an unreasonable exercise of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Kelly*, 256 Conn. 23, 41–42, 770 A.2d 908 (2001).

"Connecticut first recognized the spontaneous utterance exception in *Perry* v. *Haritos*, 100 Conn. 476, 124

---

"[911 Operator]: Can your lights come on?

"[Marshall]: The lights are on.

"[911 Operator]: The lights are on. Can you flick them? Keep on flicking your lights. He's flicking the lights because the horn is not working.

"[Marshall]: It's facing, like, an apartment complex.

"[911 Operator]: You see an apartment complex?

"[Marshall]: Yeah, it's across. . . . It's an apartment complex across from the high school. . . . I'm trying to go—

"[911 Operator]: Don't go anywhere. Stay right there. Stay in your car. Don't go anywhere. Are you back in your car?

"[Marshall]: I'm getting back in there.

"[911 Operator]: Please get back in your car. The weather is not in no condition for you to walk anywhere. Are you flicking your lights now? Is he in the back of Weaver? Lincoln? Hello? Hello? I lost him. . . ."

A. 44 (1924). Our Supreme Court explained: This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced . . . by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy, . . . and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts. . . . When the declaration follows some startling occurrence and is made with reference to it by one having an opportunity to observe the matter of which he speaks, and in such close connection to the event and under such circumstances as to negative the opportunity for deliberation and fabrication and to indicate that it was a spontaneous utterance growing out of the nervous excitement and mental and physical condition of the declarant, it is reasonably probable that it is trustworthy. The spontaneity of the utterance is the guaranty of its trustworthiness." (Internal quotation marks omitted.) *State* v. *Slater*, 98 Conn. App. 288, 295, 908 A.2d 1097, cert. granted on other grounds, 280 Conn. 950, 912 A.2d 484 (2006).

The test of whether a declarant sufficiently observed the subject of his spontaneous utterance is "whether the evidence supports a finding that the declarant had an opportunity to observe the matters described in his or her statement." *State* v. *Westberry*, 68 Conn. App. 622, 631, 792 A.2d 154, cert. denied, 260 Conn. 923, 792 A.2d 519 (2002). In this case, the state presented evidence that Marshall not only observed but also experienced the events in question. Marshall testified that his vision was not completely obscured by the duct tape, that he recognized the defendant to be a man

known as "Sticky" and that he recognized landmarks and streets out of the back car window. Marshall also testified that he heard the defendant's cohort refer to the defendant as "Sticky." Having heard this evidence, the jury was free to afford it "whatever weight it deemed appropriate in its deliberations." *State* v. *Westberry*, supra, 632.

Because the evidence supports the fact that Marshall had an opportunity to observe the matter of which he spoke, the defendant's claim that Marshall did not observe the events leading to the statements he made during the 911 call must fail.

B

The defendant additionally submits that Marshall's 911 call should not have been admitted as a spontaneous utterance because Marshall's statements to the 911 operator were not made under stress sufficient to negate the opportunity for fabrication. More particularly, the defendant asserts that even if Marshall was under stress when he began the 911 call, he was calmer and capable of deliberating by the time he identified the defendant to the operator.

We reiterate that "[w]hether an utterance is spontaneous . . . is a preliminary question of fact to be decided by the trial judge [and that] [t]he trial court has broad discretion in making that factual determination, which will not be disturbed on appeal absent an unreasonable exercise of discretion." (Internal quotation marks omitted.) *State* v. *Kirby*, 280 Conn. 361, 374, 908 A.2d 506 (2006). "The requirement that a spontaneous utterance be made under such circumstances as to [negate] the opportunity for deliberation and fabrication by the declarant . . . does not preclude the admission of statements made after a startling occurrence as long

as the statement is made under the stress of that occurrence." (Internal quotation marks omitted.) Id. "Moreover, *that* a statement is made in response to a question does not preclude its admission as a spontaneous utterance." (Emphasis added.) Id., 376.

In this case, the defendant's contention that Marshall's 911 call should not have been admitted as a spontaneous utterance because Marshall was not under sufficient stress when he identified the defendant is unpersuasive. "[T]he application of the [spontaneous utterance] exception entails a uniquely fact bound inquiry. The overarching consideration is whether the declarant made the statement before he or she had the opportunity to undertake a reasoned reflection of the event described therein." *State* v. *Westberry*, supra, 68 Conn. App. 628.

It is clear that Marshall, who had been robbed, burned, beaten, threatened with murder, forcibly removed from his apartment, tied up, driven around for an extended period of time and abandoned in wintry conditions, experienced grave stress during his entire conversation with the 911 operator. "I'm still tied up," he told the operator. "[T]hey burned and cut me. . . . [The blood] is all over my face and my head right now. Please send help." He exclaimed, "Oh, God," several times. Even after identifying the defendant as one of his kidnappers, Marshall was distressed enough to get out of the car in freezing conditions, his feet bound, so that the responding police officer would be able to find him. "Please get back in your car," urged the operator. "The weather is not in [any] condition for you to walk anywhere."

Contrary to the defendant's assertions, Marshall's statements during the 911 call were made under circumstances sufficiently stressful, indeed painful, to negate

the opportunity for deliberation and fabrication by Marshall. "The principle [justifying the spontaneous utterance hearsay exception] rests upon the common experience that utterances made under such circumstances are void of self-interest and are in the same category as exclamations of pain." (Internal quotation marks omitted.) *Perry* v. *Haritos*, supra, 100 Conn. 484–85. Considering the infliction of injuries that Marshall experienced during the robbery, as well as the apparent pain and fear that he felt during the telephone call, we find unavailing the defendant's allegation that Marshall's statements to the 911 operator were not made under stress sufficient to negate the opportunity for fabrication.

We conclude that the court did not abuse its discretion in admitting Marshall's statement to the 911 operator as a spontaneous utterance.

III

The defendant's third claim is that the court should not have permitted the jury to hear the recording of the 911 call because it was prejudicial and because it improperly accredited witness testimony. The defendant specifically argues that due to the emotional nature of the tape of the 911 call and the fact that it was introduced during the state's direct examination of Marshall, the tape served to bolster Marshall's testimony with prior consistent statements in violation of the Connecticut Code of Evidence. We are not persuaded.

"The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Brisco*, 84 Conn. 120, 132, 852 A.2d 746, cert. denied, 271 Conn. 944, 861 A.2d 1178 (2004). "The

trial court, because of its intimate familiarity with the case, is in the best position to weigh the relative merits and dangers of any proffered evidence." (Internal quotation marks omitted.) *State* v. *Bailey*, 32 Conn. App. 773, 782, 631 A.2d 333 (1993).

In *State* v. *Evans*, 44 Conn. App. 307, 689 A.2d 494, cert. denied, 240 Conn. 924, 692 A.2d 819 (1997), this court determined that a trial court's decision to permit a jury to hear a 911 call was proper because the court did not abuse its discretion in admitting the evidence. "We have previously outlined four situations where prejudice to the defendant could outweigh the probative value of evidence. These are: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it. . . . We have also noted, however, that ultimately, [a] trial court has broad discretion in determining whether the probative value of proffered evidence is outweighed by the prejudice that is likely to result from its admission. . . . We will not overturn its decision absent an abuse of discretion." (Citation omitted; internal quotation marks omitted.) Id., 314–15.

"Because of the inherent difficulties in weighing these considerations against the need for relevant evidence, the resolution of this determination has been traditionally entrusted to the trial court. . . . Every reasonable presumption must be given in favor of the correctness of the court's ruling, and reversal will ensue only where an abuse of discretion is manifest or where injustice

appears to have been done. . . . Prejudice is not measured by the significance of the evidence which is relevant but by the impact of that which is extraneous." (Internal quotation marks omitted.) Id., 315.

The defendant's argument that the court's admission of the recording of the 911 call served to accredit Marshall's testimony is without merit. The court explained to counsel that the purpose of admitting the 911 call pertained to its relevance: "[T]he evidence offered is relevant in that the exhibit tends to establish that a violent crime had occurred. The crying and upset that is heard on the tape is relevant to the defendant's intent to cause serious physical injury. The jury could find that the witness was upset due to the infliction of injury. The jury could further find [that] physical force was used and further verif[y] how long the witness was in the car, [which is] relevant, obviously, to the counts of kidnapping. The length of time is also relevant to this witness' identification of the defendant, how long a look he was able to get. It also verifies the fact that at one point in time, the individual in the car with him, [in] the BMW, was referred to as 'Sticky.' It further establishes, obviously, the violent nature of the attack. The defendant herein [was] charged with robbery first degree, assault [in the] first degree and kidnapping. Obviously, that evidence is relevant with respect to those counts. The court therefore finds that the probative value of this proffered evidence outweighs its prejudicial effect."

Nowhere in its charge to the jury did the court suggest that the 911 call accredited or supported Marshall's testimony. Rather, the court instructed the jury that "any conduct or statement of a witness which you find consistent with any other conduct or statement of that witness you may also consider in weighing the credibility of that witness." Such credibility determinations factor into jury determinations about the relevance of

testimonial evidence. Moreover, the court explained that it found the 911 call relevant in establishing that a crime had occurred. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue . . . [E]vidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . So long as the evidence may reasonably be construed in such a manner that it would be relevant, it is admissible." (Citations omitted; internal quotation marks omitted.) *State* v. *Bruno*, 236 Conn. 514, 549, 673 A.2d 1117 (1996).

The defendant cites *State* v. *Suckley*, 26 Conn. App. 65, 72, 597 A.2d 1285, cert. denied, 221 Conn. 901, 600 A.2d 1028 (1991), in support of his claim that the court's admission of the 911 call violated the Connecticut rules of evidence. The facts of this case, however, unlike the facts of *Suckley*, do not require the application of § 6-11 (a) of the Connecticut Code of Evidence, which provides in relevant part that "the credibility of a witness may not be supported by evidence of a prior consistent statement made by the witness." See C. Tait, Connecticut Evidence (3d Ed. 2001) § 6.27.2, p. 440 (discussing prohibition of "[e]vidence accrediting or supporting a witness's honesty or integrity [before] the witness's credibility has first been attacked").[6] In *Suckley*, we concluded that the court's admission of a photograph unrelated to the charges was improper because

---

[6] Under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), the defendant can prevail on his unpreserved claim only if the following four conditions are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." "The first two questions relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review." (Internal quotation marks omitted.) *State* v. *Iassogna*, 95 Conn. App. 780, 787, 898 A.2d 237 (2006).

the court admitted the photograph to bolster a witness' credibility rather than for its relevance. *State* v. *Suckley*, supra, 72. In this case, the reverse is true: the court permitted the jury to hear the 911 call, which related to the charges, for its relevance and not to bolster witness testimony.

Because the recording tended to support the fact that a robbery had occurred, the court acted within its discretion in admitting it. "All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *Jewett* v. *Jewett*, 265 Conn. 669, 680, 830 A.2d 193 (2003). The 911 recording was not unfairly prejudicial; although the jury may have detected suffering and fear in Marshall's voice, we cannot conclude that the recording unduly aroused the jury's emotions. See *State* v. *Rodriguez*, 91 Conn. App. 112, 122–23, 881 A.2d 371, cert. denied, 276 Conn. 909, 886 A.2d 423 (2005). With or without the aid of a tape, a reasonable person would assume a person in Marshall's position to be distressed. See id.

The tape also was not cumulative because it presented new material. "[I]f evidence presents new matter, it is obviously not cumulative with evidence previously received." (Internal quotation marks omitted.) Id., 122. In *Rodriguez*, this court concluded that the trial court did not abuse its discretion in admitting a 911 recording because "[t]he prosecutor questioned [the witness] about the events leading to the call, then played the recording and questioned her about the events following the call." Id., 123. Similarly, in this case, the recording of the 911 call presented matters not covered by Marshall's testimony, such as the fact that Marshall was disoriented, the fact that Marshall was bleeding profusely and the nature of Labbe's rescue of Marshall.

We conclude that the court did not abuse its discretion by permitting the jury to hear the recording of the 911 call.

## IV

The defendant's fourth claim is that the court improperly charged the jury that it could use out-of-court statements to accredit witness testimony. Specifically, the defendant alleges that the court's instruction that the jury could consider witness testimony consistent with prior statements by the same witness allowed the jury to accredit the statements Marshall made during the 911 call in violation of the Connecticut Code of Evidence.

The defendant did not preserve his claim at trial but seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We conclude, however, that this claim is not reviewable under *Golding* because the claimed instructional error is evidentiary in nature and is not of constitutional magnitude.

"Evidentiary claims do not merit review pursuant to *State* v. *Golding*, [supra, 213 Conn. 239–40], because they are not of constitutional magnitude. [R]obing garden variety claims [of an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature. . . . Putting a constitutional tag on a nonconstitutional claim will no more change its essential nature than calling a bull a cow will change its gender." (Internal quotation marks omitted.) *State* v. *Cromety*, 102 Conn. App. 425, 431, 925 A.2d 1133, cert. denied, 284 Conn. 912, 931 A.2d 932 (2007). We decline to review the defendant's fourth claim, as it fails under the second prong of *Golding*.

## V

The defendant's final claim is that the prosecutor improperly commented on the 911 call during final argument to the jury. The defendant alleges that the prosecutor aroused the passions of the jury by describing

Marshall's ordeal as an "unimaginable horror" and that he vouched for the veracity of Marshall's statements by reminding the jury that Marshall identified the defendant during the 911 call. We disagree.

Our Supreme Court has established an analytical framework for reviewing cases involving alleged prosecutorial impropriety[7] to which no objection was raised at trial. See *State* v. *Stevenson*, 269 Conn. 563, 849 A.2d 626 (2004). "[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. . . . As we have indicated, our determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial."[8] (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 361–62, 897 A.2d 569 (2006).

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety]

[7] "The use of the term 'prosecutorial impropriety,' when reviewing allegedly improper statements by a prosecutor at trial, is more appropriate than the traditional term of 'prosecutorial misconduct' . . . ." (Citation omitted.) *State* v. *Fauci*, 282 Conn. 23, 26 n.2, 917 A.2d 978 (2007).

[8] "In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, we focus on several factors: (1) the extent to which the [impropriety] was invited by defense conduct or argument; (2) the severity of the conduct; (3) the frequency of the conduct; (4) the centrality of the [impropriety] to the critical issues of the case; (5) the strength of the curative instructions adopted; and (6) the strength of the state's case." *State* v. *Williams*, 41 Conn. App. 180, 190, 674 A.2d 1372, cert. denied, 237 Conn. 925, 677 A.2d 950 (1996).

has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . . This heightened duty derives from . . . the special role played by the state's attorney in a criminal trial. He is not only an officer of the court . . . but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. In discharging his most important duties, he deserves and receives in peculiar degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment." (Internal quotation marks omitted.) *State* v. *Camacho*, 282 Conn. 328, 367–68, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007). "If the accused be guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe.

While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 745–46, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).

It is well established that "a prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument. . . . A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 400, 832 A.2d 14 (2003).

With these principles in mind, we turn to the defendant's specific allegations of prosecutorial impropriety during closing argument, noting that defense counsel raised no objection to the state's rebuttal arguments. Although that fact is by no means dispositive of the defendant's claim on appeal, we nevertheless consider it in reviewing the merits of an unpreserved claim of prosecutorial impropriety. See *State* v. *Skakel*, supra, 276 Conn. 769 n.107.

"As a general matter, a prosecutor may use any evidence properly admitted at trial." *State* v. *Camacho*, supra, 282 Conn. 377. In *Camacho*, our Supreme Court held a prosecutor's use of a 911 recording during closing

argument to be proper. Id., 378. "[T]he prosecution, with its burden of establishing guilt beyond a reasonable doubt, is not to be denied the right to prove every essential element of the crime by the most convincing evidence it is able to produce." (Internal quotation marks omitted.) *State* v. *Evans*, supra, 44 Conn. App. 316.

During his rebuttal argument, the prosecutor in this case made the following statements: "I would submit to you [that] when you listen to this tape, you're not listening to someone who's reflecting. What you're listening to is a terrified, terribly emotional man who has just gone through an unimaginable horror. And he does identify [the defendant] on that tape, and he does so twice." As we have noted, the recording of the 911 call was admitted as a full exhibit. Accordingly, it fell within the rule as previously explained under our case law that "[a]n exhibit offered and received as a full exhibit is in the case for all purposes." *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole*, 189 Conn. 518, 525, 457 A.2d 656 (1983). Furthermore, these allegedly improper statements were consistent with the purposes the court cited for admitting the tape into evidence, namely, to establish that a robbery had been committed, that injuries had been inflicted on Marshall and that he had spent a considerable amount of time with the defendant he identified.

It is significant that the comments the defendant now complains of were made during the state's rebuttal argument. We have held that where "[i]t is clear that the prosecutor merely was marshaling the evidence for the fact finder to consider when assessing the credibility of the witnesses . . . the prosecutor's comments were not improper." *State* v. *John M.*, 87 Conn. App. 301, 313, 865 A.2d 450, cert. granted on other grounds, 273 Conn. 916, 871 A.2d 372 (2005). Contrary to the defendant's assertions, the prosecutor's statements did not

improperly arouse the jury's emotions but, rather, marshaled the evidence to rebut defense counsel's argument that Marshall reflected and deliberated before he spoke to the 911 operator. The prosecutor also did not vouch for the veracity of Marshall's statements. Rather, he countered the allegation made during defense counsel's final argument that Marshall told the 911 operator that he could not identify his attacker.

Because we do not find it reasonably likely that the prosecutor's comments confused the jury or prejudiced the defendant in this case, we conclude that the commentary at issue did not rise to the level of prosecutorial impropriety. "A prosecutor . . . is permitted to comment upon the evidence presented at trial and to argue the inferences that the [fact finder] might draw therefrom . . . ." (Internal quotation marks omitted.) Id., 313. In this case, the prosecutor merely urged the jury to draw reasonable inferences from the facts. See *State v. Skakel*, supra, 276 Conn. 751.

Having rejected the defendant's claim that the prosecutor's comments about the 911 recording during closing argument constituted prosecutorial impropriety, we need not reach the issue of whether prosecutorial impropriety deprived the defendant of his due process right to a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.